UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 21-cr-430 (TJK) |
| v. | : | |
| | : | |
| MICHAEL ADAMS, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Michael Adams to 90 days of incarceration and $500 restitution.

I.   **Introduction**

Defendant Michael Adams, a 28-year-old who works in automobile repair, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Adams pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). A sentence of 90 days of incarceration is appropriate in this case because Adams: (1) climbed onto the media tower and cheered on the mob; (2) entered the Capitol through the Parlimentarian Door shortly

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

after the mob breached it with a crowbar—which Adams likely saw; (3) entered the ransacked Parlimentarian's office; (4) entered the Capitol a second time through a window near the Senate Wing Door; (5) entered Senator Merkley's office; (6) has a felony criminal history; and (7) was a fugitive in this case for nearly a year and a half. When considered together, it is clear that Adams is a recidivist offender and that a serious sentence is needed to deter him from future misconduct.

The Court must also consider that Adams's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Adams's crime support a sentence of 90 days of incarceration.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 37 (Statement of Offense), at 1-3.

*Adams's Role in the January 6, 2021 Attack on the Capitol*

Adams joined a mob that marched onto Capitol Grounds near the Lower West Front. He wore a red "Trump" hat, dark jacket, blue shirt with a plaid shirt visible underneath, red, white, and blue neckwear, and carried a flag and a longboard with orange wheels. *See Image 1 below*.



*Image 1*

Adams climbed the media tower on the Lower West Terrace and shouted with the mob. *See Image 2 below.*



*Image 2*

Adams then climbed up to the Upper West Terrace and entered the Capitol through the Parliamentarian Door. At one point, Adams stood on top of the railing next to the Parliamentarian Door. *See Image 3 below*. Adams likely saw the mob violently breach this door with a crowbar just a few minutes earlier.


*Image 3*

Adams entered the Parliamentarian's Office and saw documents, phones, and masks strewn on the floor and around the room. While inside, he also looked closely at a broken window. *See Image 4 below*. He exited the office at 2:49 p.m. Adams was in the building near the Parliamentarian's Office from around 2:46-2:59 p.m.


*Image 4*

4

Adams breached the Capitol Building a second time at 3:14 p.m. through the broken window north of the Senate Wing Door. *See Image 5 below.*



*Image 5*

He entered Senator Merkley's Office through an unlocked door. *See Image 6 below.*



*Image 6*

Adams remained in the building until around 3:20 p.m. Combining his two breaches of the Capitol Building, Adams was inside for at approximately 19 minutes and entered at least two private offices.

At around 4:00 p.m., Adams remained on the Upper West Terrace and a few feet away from a line of police officers wearing riot helmets and shields. By 4:21 p.m., Adams was still on the Upper West Terrace and encountered law enforcement officers who directed him to leave. *See Image 7 below*.


*Image 7*

At approximately 4:25 p.m., Adams was still on the Upper West Terrace and witnessed a line of police officers advance and use teargas while attempting to clear the area.

But Adams did not leave the grounds at that point. He continued around the Capitol Building to the North and East and approached the North Door. Adams stood a few feet from the door as a law enforcement officer oversaw rioters leaving through the door. *See Image 8 below*.

6



*Image 8*

Adams was within the restricted area on Capitol Grounds for at least two hours, likely longer. He was still near the Capitol after dark.

*Adams was a Fugitive from July 16, 2021 to January 5, 2023*

On June 28, 2021, Magistrate Harvey reviewed Pretrial Services Agency Status Report 11, which noted that Adams had an open warrant in Fairfax County, Virginia issued on May 9, and ordered that Adams self-surrender by June 30. Adams failed to self-surrender in Fairfax County and later did not appear for arraignment before this Court on July 8, 2021. After receiving a personal recognizance bond, Adams failed to appear for the arraignment/status conference on July 16, 2021. At that hearing, this Court issued a bench warrant. On June 7, 2022, Adams's case was reassigned to the Calendar Committee since he had been a fugitive since July 16, 2021.

Adams remained a fugitive until he self-surrendered on January 5, 2023—nearly a year and a half after the Court issued the bench warrant.

*The Charges and Plea Agreement*

On April 20, 2021, the United States charged Adams by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On April 22, 2021, law enforcement officers arrested him in Alexandria, Virginia. On June 25, 2021, the United States charged Adams by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On May 31, 2023, pursuant to a plea agreement, Adams pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Adams agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Adams now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Adams faces up to six months of imprisonment and a fine of up to $5,000. Adams must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration and $500 restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Adams's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Adams, the absence of violent or destructive acts is not a mitigating factor. Had Adams engaged in such conduct, he would have faced additional criminal charges.

*Observation of Violence*

Adams's case is aggravated by the fact that he observed significant violence before he decided to enter the Capitol Building, and the violence and destruction did not deter him. The Lower West Terrace around 2 p.m. was the site of vicious conflict. The mob overwhelmed the line of officers around that time, so Adams would have witnessed the officers' desperate retreat. He likely had an especially clear view of this chaotic retreat from his position on the media tower. Throughout the conflict on the Lower West Terrace, Adams would have seen—and possibly smelled—law enforcement's tear gas and pepper spray.

Before entering through the Parlimentarian Door, Adams likely watched a rioter breach the door using a large crowbar since he entered only a few minutes later at 2:46 p.m. When Adams entered the Parlimentarian's office, he saw that rioters had ransacked the office. Undeterred by the violence and destruction, Adams chose to stay inside the Capitol.

*Multiple Entrances into Building and Offices*

Adams's conduct is aggravated by his choice to enter the Capitol building twice—once through the recently breached Parliamentarian Door and once through a broken window. There is

9

also a good chance Adams would have entered a third time through the North Door had it not been guarded by law enforcement in riot gear. *See Image 8 above.*

In total, Adams remained in the restricted area for over two hours. He spent most of this time on the Upper West Terrace, despite the clear presence of police in riot gear and gas masks. At 4:21 p.m., these officers touched Adams on the arm and instructed him to leave—but he remained on the Upper Terrace and continued around the building to approach the North Door. *See Image 7 above.*

*Fugitive for One and a Half Years*

This case is further aggravated by the fact that Adams fled from responsibility for over eighteen months—from Magistrate Judge Faruqui's ordered appearance to Adams's surrender. While Adams did self-surrender on January 5, 2023, this wise choice cannot absolve the eighteen months that Adams avoided taking responsibility and facing consequences.

Adams made many wrong choices on January 6. Adams repeatedly ignored obvious warning signs that he should leave. He ignored direct commands from police telling him to leave. After January 6, he continued to make wrong decisions. The court directed Adams to clear up outstanding warrants, and ordered him to make court appearances. Adams instead chose to ignore those directives. The nature and the circumstances of Adam's conduct, and his apparent inability to learn from his bad decisions, establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Adams

As set forth in the PSR, Adams was convicted of Sale and Distribution of Marihuana in Fairfax County, Virginia and sentenced on March 15, 2019 to five years jail suspended upon five years of good behavior and three years of supervised probation. The court terminated this probation

early on October 23, 2020, but Adams criminal conduct on January 6, 2021 still falls within the five years of the suspended sentence.

Adams was also convicted of Driving While Intoxicated in Fairfax County and sentenced to thirty days jail suspended upon one year of supervised probation on August 16, 2018. During that incident, the arresting officer pulled Adams over after witnessing Adams's car strike a parking curb. When Adams declined to give the officer his license, the officer let him go but followed him. Adams drove away at high speed then parked and attempted to hide in his car. While this was five years ago, the Court should note Adams' dishonest conduct prior to his arrest.

Between 2014 and 2023, Adams received seven traffic infractions. On April 11, 2021, Adams left the scene of a vehicle accident that caused more than $1,000 in damage. On January 14, 2023, he turned himself in on this case—which has since been nolle prossed. This is yet another example of Adams attempting to evade or at least postpone consequences for his actions through flight.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think

that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Adams's criminal history displays a pattern of dishonesty and attempts to evade consequences for his behavior. His attempt to hide from police in 2018, his fleeing the scene of a vehicle accident in 2021, and his extended period of flight in this case establish the need for specific deterrence to teach Adams to accept responsibility for his actions in the future.

To date, Adams has not expressed remorse or contrition for his actions on January 6. Adams's sister, who lives with Adams, created a fundraising page on GiveSendGo.com in which she wrote that Adams "was invited in the building by police, and left when they asked him to leave, so it couldn't be called trespassing."[2] The page also characterizes this legal proceeding as an injustice. Adams himself has shown a lack of remorse for his role in the attack on the Capitol on January 6 and the threat it posed to the peaceful transfer of power. It is important that the Court deter Adams specifically from ever joining a similar mob the next time his preferred candidate does not win a presidential election.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

---

[2] https://www.givesendgo.com/Free_Gareth_Adams

13

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Adams based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Adams has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

A defendant's entry into a sensitive space, such as a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because invading the office of a member of Congress represents a show of intimidation, an attempted display of power, above and beyond entering the building. While Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns.

Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3. Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows:

15

"That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

Perhaps the most analogous case to Adams is *United States v. Nathan Entrekin*, 21-cr-686. Like Adams, Entrekin entered the Capitol building twice and entered the Parliamentarian's office and other office spaces. Entrekin also had criminal history, though his included a Threatening and Intimidating conviction. Judge Pan sentenced Entrekin to a split sentence including 45 days jail.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol, and Judge Chutkan sentenced the defendant to 45 days of incarceration.

Adams's case has one significant aggravating factor not present in the comparison cases cited above. Adams made a decision to flee and remain a fugitive for nearly a year and a half, and that decision should result in additional consequences.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Adams must pay $500 in restitution, which reflects in part the

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

role Adams played in the riot on January 6.[5] Plea Agreement at 6. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of March 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Adams's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 97.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Adams to 90 days of incarceration and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   s/ *Tighe R. Beach*
TIGHE BEACH
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20001
(240) 278-4348
Tighe.beach@usdoj.gov
CO Bar No. 55328

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).